IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

                         *

ROY J. CHAMBERS,          *

    Plaintiff,          *

v.                  *    CIVIL NO.: WDQ-03-1865

CITY OF FREDERICK, et al.,  *

    Defendants.        *

*   *   *   *   *   *   *   *   *   *   *   *   *

MEMORANDUM OPINION AND ORDER

In 1955, during the burst of marketing enthusiasm that accompanied the theatrical release of the movie "The Ten Commandments," Cecil B. Demille distributed some 5,500 stone copies of the commandments throughout the United States. Trial Tr. at 181.  The city of Frederick, Maryland was the recipient of one of the copies.  *Id.*[1]

---

[1]The monument is made of granite, stands slightly less than five feet tall, and reads:
    the Ten Commandments
    I AM the LORD thy GOD.
    Thou shalt have no other gods before me.
    Thou shalt not make to thyself any graven images.
    Thou shalt not take the Name of the Lord thy God in
    vain.
    Remember the Sabbath day to keep it holy.
    Honor thy father and thy mother that thy days may be
    long upon the land which the Lord thy God giveth
    thee.
    Thou shalt not kill.
    Thou shalt not commit adultery.

The monument is located on the Bentz Street Memorial

Ground in Frederick, Maryland ("the Memorial Ground").  Jt.

Stipulation of Facts at ¶ 1.  The Memorial Ground, originally

a graveyard of the Evangelical Reformed Church of Frederick

("Evangelical Church"), was conveyed to the City of Frederick

("Frederick") and Frederick County in 1924.  *Id.* at ¶ 3.

Pursuant to the deed of conveyance, Frederick and Frederick

County were required to maintain the land as a memorial ground

and to "preserve and maintain in a clean, orderly, dignified

and reverential manner the land hereby conveyed." *Id.*  The

monument faces and is visible from Bentz Street, a main road

for southbound traffic through downtown Frederick, and is

about 23 feet away from the curb.  *Id.* at ¶ 7.; Trial Tr. at

123; 137-39.  Next to the commandments monument stands the

"Names Memorial," a monument which lists the names of the

---

Thou shalt not steal.
Thou shalt not bear false witness against thy
neighbor.
Thou shalt not covet thy neighbor's house.
Thou shalt not covet thy neighbor's wife, nor his
manservant, nor his maidservant, nor his cattle, nor
anything that is thy neighbor's.
Jt. Stipulation of Facts at ¶ 1.  Beneath the text of the
commandments are engravings of two Stars of David and a
Christogram comprised of the Greek letter Rho superimposed on
the letter Chi.  *Id.*  At the top of the monument is an
engraving of two tablets, an "Eye of Providence," and an eagle
gripping the American flag.  *Id.*

persons buried in the Memorial Ground.  Jt. Stipulation of
Facts at ¶ 2.  The two monuments are arranged in an arc
several feet from the sidewalk, facing a park bench.  *Id.* at ¶
7.

After a relatively lengthy period of quiet acceptance of
Demille's beneficence, the commandments monument became the
focus of a suit by the American Civil Liberties Union ("the
ACLU") in March 2002.  *Id.* at ¶ 8.  The ACLU argued that the
monument's location in a public park violated the
Establishment Clause.  *Id.* In July 2002, the local Fraternal
Order of Eagles ("FOE"), which had donated the monument to
Frederick in 1958, learned of the controversy surrounding the
monument's location and offered to purchase all or part of the
Memorial Ground.  Trial Tr. at 183-84.

On November 20, 2002, Frederick's Board of Aldermen,
hoping to avoid litigation, voted to authorize the Mayor of
Frederick to sell the monument and the parcel of land where it
is located.  *Id.* at 40-41, 168.  The parcel to be sold
measured 8,342 square feet and contains the "Names Memorial"
as well as the commandments monument.  Jt. Ex. 31 (Real
Property Consultants appraisal report).

Frederick's Facilities Administrator, Pat Keegin, was
charged with handling the bidding process and sale.  Trial Tr.

at 66-67.  Although the Board of Aldermen had adopted a

Resolution outlining procedures for selling City-owned

property, Keegin mistakenly believed that the Resolution did

not govern the sale of land in the Memorial Ground.  *Id.* at

75.  Keegin did not believe that Frederick was required to

publicly advertise the parcel's sale because the size of the

property was quite small. *Id.* at 109-110.  The ACLU lawsuit

brought significant attention to the monument's fate, however,

thus several newspapers ran stories about Frederick's decision

to sell the parcel.  *Id.* at 84, 92.

By November 27, 2002, at least eight people or

organizations had contacted Frederick to express interest in

buying the parcel.  *Id.* at 83.  Each potential buyer received

a letter from Keegin outlining the terms of the sale.  *Id.* at

88.  Frederick also sent unsolicited sales letters to at least

eight local civic organizations, including the FOE.  *Id.* at

85-87.

On December 3, 2002, the ACLU, satisfied that Frederick

was selling the monument and the land beneath it, agreed to

voluntarily dismiss its suit.  Jt. Ex. 9 (dismissal

agreement).

By mid-December 2002, Frederick had received four offers

4

to purchase the property.  *Id.* at 113.[2]  In selecting a buyer,

Keegin considered each bidder's ability to pay the appraised

value of the property, willingness to abide by the covenants

of the deed to the Memorial Ground, and ability to maintain

the property.  Jt. Ex. 26 (Keegin memo explaining selection

criteria).  Keegin was concerned that several of the bidders

appeared unable to maintain the property.  Trial Tr. at 114-

16.  One of the bidders, Herbert Schuck, was an older

gentleman and it was unclear to Keegin whether his estate

would be able to care for the property in the event of

Schuck's death.  *Id.* at 114-15.  Another bidder, the Peroutka

Foundation, was a relatively new organization and was not

located in Frederick.  *Id.* at 115-16.  Keegin also questioned

whether a third bidder, the Fredericktown Bank and Trust,

involved in merger discussions with another bank, could be

relied upon to maintain the site.  *Id.* at 52.  Because the FOE

was the only bidder that could clearly comply with all of

Keegin's selection criteria, he recommended to Frederick's

Mayor that the parcel be sold to the FOE.  *Id.* at 97.

Frederick had no knowledge the FOE's plans for the  monument,

---

[2]Two of the offers came from organizations that had
neither requested nor received bid packets.  Trial Tr. at 113-
114.

nor did it require that the monument remain located in the Memorial Ground.  *Id.* at 54.

Frederick had prepared most of the deed of sale to the property prior to Keegin's selection of the winning bidder. *Id.* at 55-56.  Thus, on December 23, 2002, the day Frederick decided to sell the parcel to the FOE, it executed the deed of sale.  *Id.* at 55, 187.  The FOE paid $6,700 for the parcel, its full appraised value.  *Id.* at 188.[3]  Since the sale, the FOE has been solely responsible for the maintenance of the parcel and the commandments monument.  *Id.* at 49, 174.

On June 24, 2003, Roy Chambers, a resident of Frederick who lives within eight blocks of the commandments monument and comes into contact with it regularly, brought this suit alleging that Frederick's sale of the monument and the land on which it sits was a sham which failed to cure its Establishment Clause violation.  Because Frederick and its Mayor acted under color of state law in selling the parcel, Chambers asserts that he is entitled to relief under 42 U.S.C. § 1983.  The Court held a bench trial on January 18, 2005. The parties submitted proposed findings of fact and

---

[3]Frederick retained ownership of the "Names Memorial," although it is located on the parcel of land sold to the FOE, because it is obligated to maintain that monument by the deed of conveyance from the Evangelical Church.  Trial Tr. at 36.

conclusions of law.

ANALYSIS

The Establishment Clause states that "Congress shall make
no law respecting an establishment of religion."  U.S. CONST.
amend. I.[4]  The Establishment Clause "prohibits government
from appearing to take a position on questions of religious
belief or from 'making adherence to a religion relevant in any
way to a person's standing in the political community.'"
*County of Allegheny v. Amer. Civil Liberties Union*, 492 U.S.
573, 594 (1989) (*quoting Lynch v. Donnelly*, 495 U.S. 668, 687
(1984) (O'Connor, J., concurring)).

The Court assumes, without deciding, that Frederick's
longtime display of the commandments monument on city property
violated the Establishment Clause.  Chambers asserts that
Frederick's sale of the monument and the land on which it sits
failed to ameliorate its Establishment Clause violation
because the transaction was a sham, designed to permit the
ongoing display of the monument in its present location on the
Memorial Ground, while circumventing the government action
requirement of the Establishment Clause.  Frederick counters

---

[4]The Establishment Clause is made applicable to states and
localalities through the Fourteenth Amendment.  *Everson v. Bd.
of Educ. Of the Township of Ewing*, 330 U.S. 1, 15 (1947)

that it dissociated itself from any message conveyed by the
monument by selling it to the FOE.

"Absent unusual circumstances, a sale of real property is
an effective way for a public body to end its inappropriate
endorsement of religion." *Freedom From Religion Foundation,
Inc. v. City of Marshfield*, 203 F.3d 487, 491 (7th Cir. 2000).
Adherence to a formalistic standard, however, invites
manipulation. *Id.* "To avoid such manipulation," the Court
must "look to the substance of the transaction as well as its
form to determine whether government action endorsing religion
has actually ceased." *Id.*

Chambers argues that Frederick's sale of the monument to
the FOE is suspect because Frederick failed to comply with its
own procedural requirements for public land sales, and
selected the FOE as the winning bidder although its bid was
smaller than those of its competitors.

It is true that Frederick failed to comply with its
guidelines for selling city-owned property when it sold the
monument to the FOE, and the FOE bid less for the property
than other bidders.  There is no evidence, however, of
"unusual circumstances surrounding the sale of the parcel of
land so as to indicate an endorsement of religion." *Mercier
v. Fraternal Order of Eagles*, 395 F.3d 693, 702 (7th Cir.

8

2005).  To the contrary, Frederick intended to conduct a valid

sale in order to dissociate itself from the commandments

monument.  Keegin mistakenly believed that Frederick's land

sale ordinance did not apply to the parcel of land that he was

selling, and based on his many years of experience with the

sales of city-owned property, attempted to conduct a valid

sale by responding to public requests for bidding information,

soliciting bids, and ultimately selling the property for its

independently-appraised fair market value.  *See id.* (property

sold for fair market value passes constitutional muster, even

if higher bids were tendered).  Since the parcel was sold to

the FOE, the FOE has been solely responsible for its upkeep.

*Id.* (property sale constitutional, in part, because buyers

assumed traditional duties of ownership).

     Chambers argues that even if the sale was valid, it

failed to end Frederick's Establishment Clause violation

because the layout of the park would not inform a reasonable

observer that the parcel containing the commandments monument

is privately owned.

     In *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971), the

Supreme Court established a three-part test to determine

whether government action constitutes an endorsement of

religion.  Government action does not violate the

Establishment Clause if: (1) the action has a secular purpose;

(2) the principal or primary effect of the action neither

advances nor inhibits religion; and (3) the action does not

foster excessive government entanglement with religion.

Although Frederick is not aware of any particular purpose

in accepting and displaying the monument, contemporaneous

accounts of the dedication ceremony indicate that the purposes

were to remind citizens "not to bear false witness, to deal

fairly and not to covet other's property," and to make the

park into "a haven of tranquility."  Trial Tr. at 19; Jt. Ex.

5 (*Eagles Courthouse Monument*, THE NEWS, June 30, 1953, at 22).


In determining whether government action affecting a

religious symbol has a secular purpose, a government's

characterization of its purpose it entitled to deference, so

long as the stated purpose is sincere.  *Mercier*, 395 F. 3d at

704 (*citing Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290,

308 (2000)).  As there is no evidence of religious purpose for

Frederick's display, and no indication that its secular

purpose was insincere, the Court finds that Frederick had a

secular purpose in displaying the monument.  This conclusion

is bolstered by Frederick's decision to dissociate itself from

the monument in response to accusations that it was endorsing

a religious message.  *See Mercier*, 395 F.3d at 705 ("[A]

government can remedy a potential Establishment Clause

violation by selling the real property where the religious

monument sits. . . .  By selling the monument site to end a

perceived endorsement, the City exercised an option that

served a secular purpose.").

Government action violates the effect prong if

"irrespective of the government's actual purpose, the practice

under review in fact conveys a message of endorsement or

disapproval."  *Lynch*, 465 U.S. at 690.  When the Court finds

that a reasonable person could perceive that a government

action conveys a message that religion or a particular

religious belief is favored or preferred, the Establishment

Clause has been violated.  *Freedom From Religion*, 203 F.3d at

493 (*citing Capitol Square Review & Advisory Bd. v. Pinette*,

515 U.S. 753, 778-79 (1995) (O'Connor, J., concurring)).

The reasonable person, in this context, is "similar to

the 'reasonable person' in tort law, who 'is not to be

identified with any ordinary individual, who might

occasionally do unreasonable things,' but is 'rather a

personification of a community ideal of reasonable behavior,

determined by the [collective] social judgment.'" *Capital

Square*, 515 U.S. at 779-80 (O'Connor, J., concurring) (*quoting*

11

W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts 175 (5th ed. 1984)).  The reasonable observer is "deemed aware of the history and context of the community and forum in which the religious display appears." *Id.* at 780.

It is true that a passerby may gather, based on the monument's location on the Memorial Ground, that Frederick endorses its message.  But a reasonable observer, familiar with the history of the commandments monument, and the litigation surrounding its location, would understand that Frederick sold the property to the FOE to dissociate itself from whatever message the monument conveys.  *See Mercier*, 395 F.3d at 705.  A reasonable observer would also understand that the FOE, as the monument's original owner and the bidder best prepared to care for the parcel of land conveyed in the sale, was a logical purchaser for the property.  *See id.*  In light of these historic and secular considerations, and the FOE's freedom to remove the monument at any time, no reasonable observer would believe the continued display on the Memorial Ground was intended to advance religion.  *See id.*[5]

---

[5]The Court will not discuss whether the monument's location on the Memorial Ground causes excessive entanglement with a religious message because the parties have not addressed this issue.

12

CONCLUSION

For the reasons discussed above, the Court finds Frederick's sale of the commandments monument and the land on which it sits, and its continued display on the Memorial Ground, constitutional.


 June 21, 2005                          /s/                        
Date                            William D. Quarles, Jr.
                                United States District Judge